UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| EDWARD M. PARTLOW, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:18-cv-01469-SEB-DML |
| RICHARD BROWN, et al. | ) ) ) | |
| Defendants. | ) | |

**ENTRY GRANTING MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DECLINING SUPPLEMENTAL JURISDICTION OVER CLAIMS AGAINST STATE DEFENDANTS, AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Edward M. Partlow brought this action to recover for injuries he suffered while he was incarcerated at Wabash Valley Correctional Facility ("WVCF"). Dkt. 2. What remain in this action are state-law negligence claims against WVCF Warden Richard Brown and Safety Hazard Manager J. Hendrix and Eighth Amendment deliberate indifference claims against Nurse Barbara Riggs and her employer, Wexford Medical of Indiana, LLC.[1] Dkts. 14, 53. Mr. Partlow's claims arise from injuries he suffered after a block of ice fell from an ice machine and struck him on the arm. He alleges that the State Defendants knew the ice machine was defective and failed to repair it or post a warning; he alleges that the Medical Defendants were deliberately indifferent to the injuries he suffered.

All defendants moved for summary judgment. Dkts. 67, 69, 70–72. For the reasons explained below, the Medical Defendants' motion for summary judgment, dkt. [70], is **granted**,

---

[1]The **clerk is directed** to update the defendants' names on the docket to Richard Brown, J. Hendrix, Barbara Riggs, and Wexford of Indiana, LLC. The Court refers to Warden Brown and Mr. Hendrix as the "State Defendants" and to Nurse Riggs and Wexford as the "Medical Defendants."

and the Court declines to exercise supplemental jurisdiction over Mr. Partlow's remaining state-law claims against the State Defendants.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Unsworn statements do not satisfy the requirements of Rule 56. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006). Likewise, statements that "fall outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or [are] merely conclusory do not meet this requirement." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A

genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Mr. Partlow are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

## II. Relevant Facts

The State Defendants and the Medical Defendants filed statements of undisputed material facts. *See* dkt. 69 at 2–3; dkt. 71 at 2–5. In his responses, Mr. Partlow identifies some facts that he contends are disputed. *See* dkt. 75 at 2–4; dkt. 78 at 2–5. The Court accepts those facts as true to the extent they are supported by admissible evidence in keeping with its duty to construe the record in the light most favorable to Mr. Partlow.

### A. *Nurse Riggs and Wexford Policies*

Barbara Riggs is a registered nurse who works at WVCF. Dkt. 72-1 ¶ 1. She is employed by Wexford. *Id.* Wexford employs medical staff and provides medical services at WVCF pursuant to a contract with the Indiana Department of Correction ("IDOC"). Dkt. 30 ¶ 8.

Nurse Riggs does not have the ability to diagnose an inmate or prescribe medication because those activities are outside the scope of her practice. Dkt. 72-1 ¶ 10. Instead, she can refer an inmate to a doctor for additional assessment and treatment if medically appropriate. *Id.*

At WVCF, Nurse Riggs has been assigned primarily to nursing sick call. *Id.* ¶ 4. She collects and triages Request for Health Care forms ("RHCFs") from inmates. *Id.* All inmates must

submit a RHCF for routine medical services and supplies. *Id.* The forms are collected at least once a day and reviewed by nursing staff. *Id.* Typically, an inmate will be called to nursing sick call for a face-to-face assessment. *Id.* Based on the assessment, nursing staff will either provide the appropriate education and supplies necessary to treat and/or monitor the condition or refer the inmate to a provider for further evaluation. *Id.* Objectively urgent and emergent problems are addressed immediately. *Id.*

During Nurse Riggs's employment with Wexford, the company has not maintained a policy for treating orthopedic injuries. *Id.* ¶ 8. Instead, medical staff are guided by applicable Health Care Services Directives maintained and authored by IDOC. *Id.* In addition, in determining whether a given issue is urgent or emergent, medical staff are guided by their medical judgment and objective findings during assessments. *Id.*

When an inmate complains about an injury that is neither urgent nor emergent, Nurse Riggs advises the inmate to fill out and submit a RHCF to document the complaint and schedules the inmate for assessment during nursing sick call. *Id.* ¶ 9.

### B.     *Mr. Partlow's Injury and Treatment*

Mr. Partlow was incarcerated at WVCF from July 2014 to December 2017. Dkt. 72-8 at 10:15–18.[2] Between 6:47 and 7:00 p.m. on Thursday, August 3, 2017, Mr. Partlow went to the ice machine in his housing unit. *Id.* at 16:14–17:15, 54:9–10. The machine was an industrial machine with a mechanism on top and a big bin of ice on the bottom. *Id.* at 37:10–19. The ice could be accessed by a swinging door. *Id.* at 37:20–38:1. When Mr. Partlow reached in to scoop some ice, a block of ice fell from the top portion of the machine and hit the lower half of his forearm. *Id.* at

---

[2]Citations to Mr. Partlow's deposition are to the original transcript page numbers, not the numbers "stamped" on the document when it was filed in CM/ECF.

17:10–18, 30:4–19, 35:17–25, 90:3–13.[3] Mr. Partlow saw blood. *Id.* at 17:12. A sergeant wrapped the arm to stop the bleeding and said he would try to get a nurse over during sick call. *Id.* at 18:1–7.

About two hours later, a nurse (whose name may have been "Amy") arrived. *Id.* at 18:6–7, 53:21–54:3. When Mr. Partlow showed her his arm she said, "That's ugly. You should fill out a healthcare [form] for it" or words to that effect. *Id.* at 18:8–13, 57:7–13. She said she could not treat him until he filled out a healthcare form. *Id.* She gave him a healthcare form, and he started to fill it out, but she left before it was completed. *Id.* at 18:14–18. She provided no treatment. *Id.* Mr. Partlow completed the healthcare form she provided and gave it to the guards to put in the box for healthcare forms. *Id.* at 61:15–62:2.

The next morning, Mr. Partlow showed his arm to a sergeant, who in turn called Nurse Riggs. *Id.* at 18:22–24. Around 7:00 a.m., Nurse Riggs came to see Mr. Partlow. *Id.* at 18:22, 62:6–23. When she saw his arm, she said, "That's ugly. It's kind of red. It looks like it's flaring up. You should fill out a medical form." *Id.* at 62:24–63:2. She gave him a medical form but left while he was filling it out. *Id.* at 63:3–4. The sergeant called Nurse Riggs again. *Id.* at 19:10.

Mr. Partlow completed a RHCF that day. *See* dkt. 72-3. It read:

> The ice machine had no guard on it and on 4-3-17 at approximately 7:20 PM I was severely cut on the arm by falling ice.
>
> Staff failed to fill out an incident report [and] medical treatment has been delayed thus far.

*Id*. The medical department received this form on August 5. Dkt. 72-1 ¶ 6; *see also* dkt. 72-3.

---

[3] The size of the piece of ice is disputed *see, e.g.*, dkt. 71 at 2, 9; dkt. 75 at 2, but not material. The Court accepts Mr. Partlow's testimony that it was a "block" of ice. *See, e.g.*, dkt. 72-8 at 17.

Mr. Partlow filled out another RHCF the next day, Friday, August 5. Dkt. 75-1 at 2. It read, "My wrist hurts bad, ice fell on it Thursday night [and] I still have not been treated." *Id.* The next day, Saturday, August 6, another inmate gave him some antibiotic ointment. Dkt. 72-8 at 80:19–81:4. Mr. Partlow also filled out another RHCF stating, "My wrist hurt [and] has been bleeding. On Friday I was told I could not be seen. I was given ointment Saturday but I still haven[']t been seen." Dkt. 75-1 at 3. On Sunday, August 7, he filled out another RHCF, stating:

> My arm was cut by ice on Thursday 8-3-17. An incident report was filed on Friday 8-4-17. I have not been seen by medical yet!!! My arm hurts, it is red [and] irritated. On Friday night, the nurse stated she was forbidden to see me. On Saturday I was given ointment AND STILL WAS NOT SEEN!!! It hurts to write or make a fist.

*Id.* at 4.

Nurse Riggs saw Mr. Partlow about the cuts on his arm on August 8 in response to the RHCF he completed on August 4. Dkt. 72-1 ¶ 6; dkt. 72-2. In the time between his injury and the appointment with Nurse Riggs, Mr. Partlow wrapped his injury with an Ace bandage. Dkt. 72-8 at 70. The cuts on his arm had started to scab over by the time he saw Nurse Riggs on August 8. Dkt. 72-8 at 69; dkt. 72-1 ¶ 6.

At the appointment, Nurse Riggs took Mr. Partlow's vitals, which were normal. Dkt. 72-1 ¶ 6; dkt. 72-2 at 2. She assessed the cuts on his arm and told him they were superficial. Dkt. 72-1 ¶ 6; dkt. 72-2; dkt. 72-8 at 69:8–9. She observed that his injuries had scabbed over and that all the scabs were intact. Dkt. 72-1 ¶ 6; dkt. 72-2. She noted that Mr. Partlow's last tetanus booster was in December 2016 and that his cuts showed no sign of infection. *Id.* Because she assessed his injury as a superficial series of small cuts that had already begun to heal and showed no signs of infection, she advised Mr. Partlow to let the injury heal naturally. *Id.*[4] According to Mr. Partlow, she also

---

[4]In his unsworn response brief, Mr. Partlow claims that Nurse Riggs never told him to allow the injuries to heal. *See* dkt. 75 at 3 ("Nurse Riggs never advised plaintiff to allow injuries to heal."). His unsworn

6

showed him an injury she had sustained and told him he should stop being a baby because she had been stabbed with an ice pick and that was much worse than his injury. Dkt. 72-8 at 68:8–23. She also told him he should stop crying and laughed at him. *Id.*

On August 11 (three days after the appointment with Nurse Riggs), Mr. Partlow completed another RHCF, stating:

> My arm has sharp pains around my wrist area ever[] since it was hit by falling [ice] in the machine. My fingers often lock up [and] it hurts to bend my wrist back[.]
>
> I still have not been seen by a doctor or X-rayed.

Dkt. 72-5. The medical department received that form on August 14. Dkt. 72-1 ¶ 7; dkt. 72-5.

In response, Nurse Riggs saw Mr. Partlow again on August 15. Dkt. 72-1 ¶ 7. During the visit, she took Mr. Partlow's vitals, which were again within normal limits. *Id.*; dkt. 72-4. Mr. Partlow indicated that his pain fluctuated, noting that it was 5 out of 10 on a 10-point scale during the visit. *Id.* Nurse Riggs also assessed Mr. Partlow's sensory perception and range of motion. *Id.* She found both to be within normal limits. *Id.* Because he continued to complain of pain, she referred Mr. Partlow to the provider so that his wrist could be further evaluated. *Id.* An unidentified medical staff member (the signature is illegible) wrote, "Scheduled with MDSC [MD sick call] . . . 8-15-17" in the response section of Mr. Partlow's August 11 RHCF. Dkt. 72-5.

Mr. Partlow ultimately was not seen by a doctor until September 13, 2017, when he was seen by Dr. Samuel Byrd. *See* Dkt. 72-6 ¶6; dkt. 72-7. In the time between his August 15 appointment with Nurse Riggs and the September 13 appointment with Dr. Byrd, he submitted three more RHCFs complaining that his wrist still hurt and that he had not yet been seen by a

---

statements are not admissible at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and the Court does not credit them.

doctor. Dkt. 75-1 at 6–8. An unidentified certified medical assistant[5] responded to the forms dated August 20 and August 30 by writing that Mr. Partlow was scheduled to see the doctor. *Id.* at 6–7. Nurse Riggs responded to the RHCF dated September 11 on September 13 by noting that Mr. Partlow was seen by a doctor on September 13. *Id*. at 8.

During his appointment with Dr. Byrd on September 13, Mr. Partlow complained of pain as well as tingling in his forearm and fingers. Dkt. 72-6 ¶ 6; dkt. 72-7. Dr. Byrd thoroughly assessed Mr. Partlow's wrist. *Id.* He did not note any lacerations or abrasions on Mr. Partlow's forearm. Dkt. 72-6 ¶ 7; dkt. 72-7. Tests indicated that Mr. Partlow did not have carpal tunnel syndrome and that he had sufficient blood flow in his hand. Dkt. 72-6 ¶¶ 6, 10, 11; dkt. 72-7. Dr. Byrd did, however, determine that Mr. Partlow likely had De Quervain's Tenosynovitis—a condition Dr. Byrd describes as swelling of the tendons of the wrist near the thumb, usually because of repetitive wrist motion like writing. Dkt. 72-6 ¶¶ 6, 9; dkt. 72-7. Despite Dr. Byrd's finding that Mr. Partlow likely had tendon swelling that would likely resolve if his wrist were allowed to rest, Mr. Partlow insisted something was seriously wrong with his right wrist. Dkt. 72-6 ¶ 12. As a result, Dr. Byrd ordered X-rays, a 10-day supply of Prednisone, and a prescription for Mobic. *Id.*

On November 1, 2017, Mr. Partlow completed another RHCF, stating, "My wrist still hurts. It sends sharp pains up my hand [and] I wake up in excru[c]iating pain some mornings." Dkt. 75-1 at 9. An unidentified certified medical assistant responded that Mr. Partlow was scheduled to see a doctor. *Id.* It is not clear whether Mr. Partlow had another medical appointment before being transferred to a new prison in December 2017.

---

[5]The signatures are illegible, but the initials "CMA" clearly appear after the signatures. *See* Dkt. 75-1 at 6–7.

### III. Discussion

#### A. *Eighth Amendment Claims*

##### 1. *Nurse Riggs*

Mr. Partlow asserts Eighth Amendment medical care claims against Nurse Riggs. At all times relevant to Mr. Partlow's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

A medical condition is sufficiently serious if it "has been diagnosed by a physician as mandating treatment or [is] one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal quotation marks and citation omitted). "A medical condition need not be life threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* That said, it is "clearly not the case" that "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and quoted authority omitted). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks and quoted authority omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted). "Disagreement between a prisoner

and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Nurse Riggs argues that Mr. Partlow did not have an objectively serious medical condition because his cuts were only superficial. Dkt. 71 at 9–11. The Court agrees that there is no evidence from which a reasonable jury could conclude that Mr. Partlow's cuts amounted to an objectively serious medical condition for purposes of the Eighth Amendment. The record evidence establishes only that Mr. Partlow bled after being cut; that Nurse Riggs said the cuts were "ugly," "red," and "flaring up" the day after the injury; that the cuts had started to scab over four days after that encounter when Nurse Riggs examined him; and that, when Nurse Riggs saw Mr. Partlow on August 8, the cuts were small, superficial, and showed no signs of infection. The Seventh Circuit has concluded that similar injuries are not objectively serious medical conditions. *See, e.g.*, *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (split lip and swollen cheek do not rise to level of objectively serious medical need). The fact that the injuries may have caused Mr. Partlow some pain does not change the analysis because the Constitution does not require immediate treatment of all pain. *See Gutierrez*, 111 F.3d at 1372 ("[A] panel of this Court . . . opined that a toe whose toenail had been removed did not constitute a serious medical need, although, no doubt, painful[.]") (citing *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996)); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (a prison medical staff's refusal to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not violate the Constitution"); *compare Gayton*, 593 F.3d at 620 (a medical condition is objectively serious for purposes of the Eighth Amendment if it would result in unnecessary and wanton infliction of pain if not treated).

But that does not end the inquiry because Dr. Byrd also diagnosed Mr. Partlow with De Quervain's Tenosynovitis and prescribed medication. Nurse Riggs fails to explain why Mr. Partlow's De Quervain's Tenosynovitis does not qualify as a condition that has "been diagnosed by a physician as mandating treatment." *See Gayton*, 593 F.3d at 620. Instead, she argues that Mr. Partlow's symptoms did not worsen until after she saw him on August 8 and that it is implausible that the falling ice caused the condition because it is usually caused by repetitive wrist motions. Dkt. 76 at 6. Based on the location of the injury from the falling ice and the relatively short period that elapsed between the injury and the diagnosis, the Court, however, concludes that a reasonable jury could infer that Mr. Partlow was suffering from the objectively serious medical condition of De Quervain's Tenosynovitis when Nurse Riggs first became aware of his injury on August 4, 2017.

Whether Nurse Riggs was deliberately indifferent to that condition is a separate issue. The undisputed evidence shows that Nurse Riggs saw Mr. Partlow the morning after his injury; told him to fill out a RHCF; saw and assessed him one day after the medical department received that RHCF; concluded after examining him that he was suffering only from superficial cuts that had already started to scab over and were not infected; and told him to let the cuts heal naturally. The undisputed evidence also shows that, when Mr. Partlow continued to complain about his injuries, she saw him again and referred him to a doctor.

This is not a case where the risk from Nurse Riggs's decision not to provide treatment is obvious to a layperson. Thus, Nurse Riggs's decisions are entitled to a great deal of deference. *See Petties*, 836 F.3d at 729; *Pyles*, 771 F.3d at 409. Further, there is no evidence that Nurse Riggs knew or even suspected that Mr. Partlow was suffering from anything more than superficial cuts before she saw him on August 15; no evidence that she disregarded a risk of serious harm to him;

and no evidence that her chosen course of action (telling him to fill out a RHCF on August 4, telling him to let the cuts heal naturally on August 8, and referring him to a doctor on August 15) was a substantial departure from accepted medical practice. As such, Mr. Partlow's deliberate indifference claims fail.

Mr. Partlow complains that Nurse Riggs called him a baby, minimized his injury in comparison to an injury she had suffered, told him to stop crying, and laughed at him. Dkt. 75 at 3. The Court accepts, as it must, Mr. Partlow's account as true. While these remarks were insensitive and arguably unprofessional, taken in context, no reasonable jury could infer from the remarks that Nurse Riggs knew there was a serious risk of harm to Mr. Partlow and decided to do nothing about it. *See Townsend v. Cooper*, 759 F.3d 678, 690 (7th Cir. 2014) (concluding that doctor's remark that plaintiff was faking his symptoms did not support conclusion that she was deliberately indifferent); *Karraker v. Kankakee Cty. Sheriff's Dep't*, 65 F.3d 170, 1995 WL 508075 (7th Cir. 1995) ("While relations between the plaintiff and Blanchette may have been frosty (she evidently thought he was a chronic complainer; he believed he was receiving inferior treatment), an inmate is not constitutionally entitled to a warm bedside manner.").

Mr. Partlow also contends that Nurse Riggs did not refer him to be seen by a doctor until "three to five" weeks later, asserting that she only made the referral after he filled out an "additional ten" RHCFs. Dkt. 75 at 3, 4. In support, he cites to the RHCF forms summarized by the Court, above. To the extent Mr. Partlow is complaining about Nurse Riggs's failure to refer him to a doctor on August 4 or August 8, his claim fails for the reasons discussed above. To the extent he is complaining about the fact that it took nearly a month for Dr. Byrd to see him after Nurse Riggs examined him on August 15, no reasonable jury could conclude that Nurse Riggs was responsible for the delay. The record evidence shows that Nurse Riggs referred Mr. Partlow to a doctor on or

about August 15. *See* dkt. 72-1 ¶7; dkt. 72-4; dkt. 72-5; dkt. 75-1 at 6. Mr. Partlow's unsworn claim that Nurse Riggs did not, in fact, refer him to see a doctor on August 15 and, instead, only did so after he continued to file RHCFs is speculative, at best, and cannot be considered by the Court at summary judgment. *See Collins*, 462 F.3d at 760 n.1; *Stagman*, 176 F.3d at 995. Mr. Partlow has not supported his assertion with evidence, so the Court must treat the assertion that Nurse Riggs referred him on August 15 as admitted without controversy. S.D. Ind. L.R. 56-1(f)(1). Absent evidence that Nurse Riggs caused the delay, she cannot be held liable for it. *See Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 956 (7th Cir. 2019) ("[W]e can only hold [the doctor] liable if he had control over the circumstances that caused the delays.").

Finally, Mr. Partlow contends that there is a genuine issue of material fact for trial because Nurse Riggs admits that he had cuts on his forearm on August 8, but Dr. Byrd noted no lacerations or abrasions on September 13. Dkt. 75 at 4. He contends that the dispute is material because Dr. Byrd's failure to make a notation of the cuts "further goes to showing the negligent behavior of state medical defendants' and their failure to follow protocol." *Id.* But Dr. Byrd is not a defendant, and any alleged negligence on his part says nothing about whether Nurse Riggs was deliberately indifferent to Mr. Partlow's serious medical needs.

Accordingly, Nurse Riggs's motion for summary judgment is granted.

### 2. *Wexford*

Mr. Partlow also brings an Eighth Amendment policy-or-practice claim against Wexford. Because Wexford acts under color of state law by contracting to perform a government function—providing medical care to correctional facilities—Wexford is treated as though it were a municipal entity for purposes of § 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002).

To prevail on his claim against Wexford, Mr. Partlow must identify an action taken by Wexford itself (as opposed to an action taken by its agents), the requisite degree of culpability, and a causal link between Wexford's action and the deprivation of federal rights. *See Levy v. Marion Cty. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019); *see also Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) (the "critical question" in such a case is whether a "policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). Wexford can "act" through its written policies, widespread practices or customs, and the acts of a final decisionmaker. *See Levy*, 940 F.3d at 1010. In the Eighth Amendment context:

> [A]plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.

*Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997) (internal quotation marks and quoted authority omitted). Evidence of a failure to make a policy can support such a claim if the plaintiff presents evidence that the institution made a conscious decision not to act. *Glisson*, 849 F.3d at 379–81.

Mr. Partlow's official-capacity claim against Wexford fails. As Wexford points out, *see* dkt. 71 at 5, Mr. Partlow admitted at his deposition that he was unaware of any written policies that would relate to his claims, *see* dkt. 72-8 at 84:17–24. Mr. Partlow's summary judgment response brief also offers no argument on his official-capacity claim or further elaboration as to which policy or custom of Wexford allegedly cause his injuries. *See* dkt. 75 at 5–6 (with heading titled "Nurse Riggs Was Deliberately Indifferent to Plaintiff's Medical Condition" but no separate discussion of his official-capacity claim against Wexford). Wexford identified several of its

policies, practices, or customs,[6] but none of them are facially unlawful, and Mr. Partlow fails to point the Court to any evidence from which a reasonable jury could conclude or offer any explanation as to how the evidence supports a finding that Wexford adopted (or failed to change) those policies with deliberate indifference as to their known or obvious consequences.

Rather than identifying evidence or making arguments, Mr. Partlow asks two rhetorical questions that might be liberally construed as relating to his official-capacity claim: (1) "If Nurse Riggs does not have the ability to diagnose a patient or prescribe medication; why does she have the authority to determine whether or not an offenders' injury is serious enough to be seen by a doctor?" (*see* dkt. 75 at 3); and (2) "If no practice or policy is maintained by Wexford related to treatment of orthopedic injuries . . . how was Nurse Riggs equipped to assess any damage, or lack thereof to the plaintiff's arm?" (*see id.* at 4). It is possible that Mr. Partlow means to use these rhetorical questions to argue that two Wexford policies were potential causes of his injuries: (1) allowing nurses who cannot prescribe medication to decide whether a patient should see a doctor; and (2) leaving health care providers to follow IDOC's Health Care Directives and their own medical judgment, rather than formulating a separate policy on treatment of orthopedic injuries. To the extent that is his intent, though, his official-capacity claim still fails because he fails to

---

[6]Read in the light most favorable to Mr. Partlow, Nurse Riggs's summary-judgment affidavit supports the possible existence of the following policies, practices, or customs: (1) inmates must submit RHCFs for routine medical services and supplies; (2) RHCFs are collected at least once a day and reviewed by nursing staff, after which the inmate is typically called to nursing sick call for a face-to-face assessment; (3) based on the assessment, nursing staff will either provide the appropriate education and supplies necessary to treat and/or monitor the condition or refer the inmate to a provider for further evaluation; (4) objectively urgent and emergency problems are addressed immediately; (5) there is no specific policy governing orthopedic injuries; (6) medical staff are guided by the applicable Health Care Services Directives maintained and authored by IDOC and their own medical judgment and objective findings, within the scope of their practice; and (7) nurses cannot diagnose patients or prescribe medication because such activities are outside the scope of their practice. *See generally* Dkt. 72-1.

explain how the evidence supports a finding that Wexford adopted (or persisted with) these policies with deliberate indifference to their known and obvious consequences.

Accordingly, Wexford's motion for summary judgment is granted.

### B. Negligence Claims

Mr. Partlow's negligence claims against the State Defendants are rooted in Indiana law. Because they were joined with his Eighth Amendment claims, the Court exercised supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. With all the Eighth Amendment claims dismissed, the Court must determine whether it is appropriate to continue to exercise supplemental jurisdiction over the state-law claims. For the reasons that follow, the Court relinquishes supplemental jurisdiction over Mr. Partlow's negligence claims and dismisses them without prejudice.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

The Seventh Circuit has made clear that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce*

*v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

The Court finds no reason to deviate from the usual practice in this case. The statute of limitations will not have run on Mr. Partlow's state-law claims, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' efforts with respect to the state law claims in discovery and briefing will go to waste; the evidence and legal research that would have been relevant in a federal case should be every bit as relevant in a state-court proceeding. The Court decided the Eighth Amendment claims on the deliberate-indifference element, which is not at issue in the negligence claims. Finally, as always, comity favors allowing state courts to decide issues of state law.

For these reasons, the Court exercises its discretion to relinquish supplemental jurisdiction over the remaining state-law claims.

## IV. Conclusion

The **clerk is directed** to update the defendants' names on the docket to Richard Brown, J. Hendrix, Barbara Riggs, and Wexford of Indiana, LLC.

The motion for summary judgment filed by Nurse Riggs and Wexford, dkt. [70], is **granted**. The Court exercises its discretion to relinquish supplemental jurisdiction over the remaining state-law claims against the State Defendants. The State Defendants' motion for summary judgment, dkt. dkt. [67], is therefore **denied as moot**.

Final judgment consistent with this entry shall now issue. Mr. Partlow's Eighth Amendment claims against Nurse Riggs and Wexford are **dismissed with prejudice**, and his negligence claims against the State Defendants are **dismissed without prejudice**.

**IT IS SO ORDERED.**

Date: 3/4/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

EDWARD M. PARTLOW
110641
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Amanda Elizabeth Fiorini
INDIANA ATTORNEY GENERAL
Amanda.Fiorini@atg.in.gov

Marley Genele Hancock
INDIANA ATTORNEY GENERAL
marley.hancock@atg.in.gov

Jarod Zimmerman
KATZ KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com